**Richard T. ADAMS, et al., Petitioners,**

v.

**DEPARTMENT OF TRANSPORTATION, FAA, Respondent.**

**Gary S. BARACCO,\* Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, FAA, Respondent.**

**Appeal Nos. 83–1155, 83–1156.**

United States Court of Appeals, Federal Circuit.

May 18, 1984.

---

\* Under Rule 43, Federal Rule of Appellate Procedure, Marjorie F. Baracco, *surviving spouse* and personal representative of petitioner Gary S. Baracco (deceased), was substituted as a party *on motion.*

Richard J. Leighton, Washington, D.C., argued for petitioners. With him on the brief was William C. Casano, Washington, D.C.

David M. Cohen, Washington, D.C., argued for respondent. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., Sandra Spooner and Robert A. Reutershan, Washington, D.C., Diane R. Liff, Asst. Gen. Counsel for Litigation, Dept. of Transp., Washington, D.C., of counsel.

Stephen C. Cooper and Steven Z. Cohen, Southfield, Mich., were on the brief for amicus curiae on behalf of petitioner.

Stephen I. Schlossberg, Washington, D.C., was on the brief for amicus curiae the Honorable William D. Ford.

Lois G. Williams, Director of Litigation, and Gregory O'Duden, Asst. Counsel, Washington, D.C., were on the brief for amicus curiae Nat. Treasury Employees Union.

Before MARKEY, Chief Judge, and FRIEDMAN, RICH, SMITH and NIES, Circuit Judges.

MARKEY, Chief Judge.

Appeals from decisions of the Merit Systems Protection Board (Board), Docket Numbers NY 075281F0424, DC 075281F0895, sustaining the August 1981 removal of Richard T. Adams, Gary S. Baracco, and others (Adams) by the Department of Transportation's Federal Aviation Administration (agency) from their positions as Air Traffic Control Specialists. The bases for removal constituted proven charges of striking against the United States and absence without leave. We *affirm*.

### Background

The reader of this opinion is referred to this court's opinion accompanying its decision in *Schapansky v. Department of Transportation, FAA*, 735 F.2d 477 (Fed. Cir.1984) issued of even date. The discussion in *Schapansky* of facts and issues common to that case and this are adopted and incorporated in this opinion.

Except for instances in which a petitioner is identified by name, "Adams" should be read as applicable to all petitioners in these present appeals.[1]

Issues raised by Adams and *Amici* and differing in substance or detail from those discussed in *Schapansky* are discussed in this opinion.

Unlike Schapansky, petitioners here made no oral response to the notice of removal and were not shown to have voted for the strike. Only Baracco was shown to have engaged in picketing. Each present petitioner received an agency letter proposing removal for strike participation and absence without leave. Each responded

---

1. Listed in Appendix A are petitioners whose appeals are hereby decided under Appeal No. 83–1155.

only by submitting union (PATCO) prepared forms requesting time enlargements and production of documents. No petitioner denied the charges.[2] No petitioner requested opportunity for oral response, beyond the requests for extension of time to answer "in writing and orally". Nor did any petitioner testify before either the agency or the Board. Other fact differences will appear in the course of discussion on the issues.

### Issues

(1) Whether government officials created such confusion concerning the Presidential deadline and controller's ability to return to duty as to have prevented formation of an intent to strike.

(2) Whether the Board properly drew an adverse inference from petitioners' failure to testify.

(3) Whether the agency unlawfully suspended petitioners during agency proceedings by placing them in a non-duty, non-pay status without following the procedures of 5 U.S.C. § 7513.

(4) Whether the Board correctly found that the strike lasted at least through August 19, 1981.[3]

2. Adams' assertion that a sentence in one stock PATCO response (challenging any basis for a charge of committing a crime) was a denial of the charges is creative, but unavailing. The sentence was directed at the agency's use of a shortened notice period.

3. *Amici* want the removals vacated for lack of a 30 day notice, asserting: (1) notice was sent before petitioners were found striking; and (2) 18 U.S.C. § 1918, (making strikes a crime) violates the Thirteenth Amendment. Argument (1) is unfounded. 5 U.S.C. § 7513(b) requires only a "reasonable cause to believe" an employee has committed a crime. Argument (2), impressively stated, attempts too much. Nothing in § 1918 compels anyone to work against his or her will. It neither prohibits nor impedes resignations.
Adams, Baracco, and *Amici* say the removal notice provided for reply "within 7 calendar days," thus providing effectively for 6 days, in violation of 5 U.S.C. § 7513(b)(2) (reply in "not

### OPINION

#### (1) *Alleged Confusion*

Adams' brief contends that the President's announcement and agency actions respecting controllers' ability to avoid removal by returning to work were so confusing that controllers were unable to form an intent to strike. Petitioners have not told the agency, the Board, or this court what their intent was in absenting themselves from work throughout the time of the strike. Nor have they pointed to any evidence upon which anything but an intent to strike may be found, or which might counter the circumstantial evidence establishing an intent to strike.

The President announced at 11:00 a.m., E.D.T., on August 3, 1981, that controllers then striking who did not report for duty within 48 hours would forfeit their positions and "will be" terminated. Because of differences in shift schedules and time zones, the agency allowed controllers to return to work at the time of regularly-scheduled shifts that began after 11:00 a.m., on August 5, 1981.

■ The briefs say controllers thought they had been fired when they did not report to work before 11:00 a.m. on August 5, 1981, and thus "could not" take advantage of the permission to return at the time of their first regularly-scheduled shift fol-

less than 7 days"). The argument is semantic and senseless on this record. The Board held the notice itself inclusive of 7 days, though it found harmless error in a letter denying time enlargement to Baracco. Each petitioner responded to the notice within 7 days. In requesting time enlargements, petitioners said they did not think "seven days is a reasonable time". If there were error, it was harmless, no request for an oral reply time having been made within the seven day period. The burden to show harm is petitioners', 5 CFR § 1201.56(b)(1), *Shaw v. Postal Service,* 697 F.2d 1078, 1080 (Fed.Cir. 1983); yet no effort was made to show that any additional reply was or would have been attempted on the seventh day. The argument might be appropriate if the agency had refused to consider a reply filed on the seventh day because not filed "within 7 calendar days." This court does not sit, however, to decide hypotheticals.

lowing that ending of the President's grace period. The argument is disingenuous. First, the President's announcement terminated no one, least of all nonstrikers. Second, petitioners' briefs do not explain why they did not, as did 1200 other controllers, report *before* 11:00 a.m. on August 5, 1981, or why they did not notify the agency at any time before their next scheduled shifts that they were not on strike, or why they did not simply report and announce their readiness to work at the time of their scheduled shifts, *if* they had no intention of striking at any of those times.

None of the present petitioners testified that he was confused. Nor is there any evidence whatever that any controller was confused.[4] Apparently recognizing the impossibility of an agency's proving what was in an employee's mind, Adams' brief concedes that intent can be shown by circumstantial evidence. It makes no effort, however, to blunt the thrust of the view that a controller absent at commencement of the strike, but truly not intending to participate in it, would, promptly upon hearing or hearing of the President's announcement, contact the agency and relieve it of any presumption that his absence was in any manner related to the strike. Petitioners alone knew their true intent.

Nor is there a logical, common sense basis for believing that the President's announcement envisaged an actual, simultaneous "return to work" of 15,000 controllers, or for believing that all non-reporting controllers had been "fired" as of August 5. If any such belief existed, the notice petitioners received of a proposal to remove them and of their opportunity to reply should have disabused them of it. That one having *no* intent to strike would so cavalierly accept the loss of one's job as of August 5, or would fail to inquire, or would fail to report or return before 11:00 a.m. on August 5, 1981, or would fail to report for work at the next scheduled shift, or would fail to explain his absence at the agency

proceeding or before the board, simply defies rationality.

The citations of criminal cases, in which proof must meet a beyond-a-reasonable-doubt standard and in which mere proof of absence was found consistent with resignation, *e.g.*, *United States v. McCubbin*, Nos. 81–2059 through 2063 (10th Cir., Aug. 22, 1983); *United States v. Martinez*, 686 F.2d 334 (5th Cir.1982), are inapt.

Petitioners' argument that the agency had a burden to notify each controller individually that he or she had until the specific time of that controller's next scheduled shift in which to take advantage of the President's grace period is without merit. Each petitioner knew when his next regularly-scheduled shift commenced and elected not to show up at that time. Having disregarded the initial 48 hour moratorium, petitioners can hardly complain that they were not specifically and personally notified that each had an opportunity to also disregard an extension of that moratorium. There is nothing whatever of record to indicate that any petitioner would have returned or had any interest whatever in returning to work at the time of his next regularly scheduled shift. Nor is there any evidence whatever to indicate that every returning petitioner would have been turned aside. Indeed, the evidence is to the contrary.

*Ad hoc* speculations of lawyers cannot substitute for evidence of what actually occurred. Though the court has in the rare circumstances of these cases permitted counsel substantial leeway in argument, there must be evidence in the record somewhere in these cases to support counsel's arguments, for this court's decision must be based on a "review [of] the record". 5 U.S.C. § 7703(c).

The argument that confusion prevented formation of an intent to strike is at best unpersuasive.

---

**4.** The assertion that petitioner Miller did not understand the charges is directly refuted in Miller's letter, the only evidence cited in the briefs as indicating that at least one petitioner was confused.

### (2) *The Adverse Inference*

■ Once the agency had presented evidence of strike participation, it was not improper to draw an adverse inference from petitioners' refusal to testify or otherwise offer rebuttal evidence before the Board.

Adams concedes the propriety of adverse inferences in civil cases when a party is silent in the face of probative adverse evidence. *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); *Book v. Postal Service*, 675 F.2d 158 (8th Cir.1982). The briefs say failure to deny the charges is irrelevant because the agency had not presented sufficient adverse evidence. The argument is meritless. The agency had presented before the Board a *prima facie* case of strike participation fully adequate to support the charges in the absence of countervailing rebuttal.

Attacking the presiding official's decision, Adams' brief says failure to rebut the agency's allegations was in that decision considered part of the *prima facie* case itself. Petitioners declined twice, however, to explain their absences, once during the agency removal proceedings and again during the Board hearing. The first failure to deny the charges left those absences unauthorized and unexplained, thereby adding to the sufficiency of the agency's *prima facie* case. It is the Board's decision we review, and petitioners' silence before the Board, after the agency had established a *prima facie* case, fully warranted the Board's drawing of an adverse inference. "Silence is often evidence of the most persuasive character". *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923).

The judicial process is not entirely divorced from common sense and the everyday experiences of humankind. Petitioners had every reason and incentive to strenuously deny the charge of strike participation *if* they were not in truth strikers. But fear of prosecution for perjury, one may devoutly hope, has not entirely disappeared. The law and experience teach that a striker can be expected to refrain from falsely testifying under oath that his absence was due to non-strike reasons.

No error occurred in the Board's drawing of an adverse inference in this case.

### (3) *Suspension*

Petitioners argue that they should be given back pay because they were constructively suspended during the period between the notice proposing removal and the date of removal.

■ Petitioners say that *if* they had reported for duty after failing to report after their deadlines, they would not have been permitted to work. Hence, say petitioners, reporting would have been a futile act, and that failure to place them in a non-duty-with-pay status was a constructive suspension. The Board, however, correctly held as a matter of law that petitioners had to show that they were ready, willing, and able to work after their receipt of notice. No such evidence was offered by these petitioners.

When petitioners failed to report to work as scheduled, they were considered absent without leave and were not paid. Like most federal employees, petitioners were not paid for unworked time, unless that time was scheduled as paid leave. Petitioners nonetheless claim entitlement to pay during a time when, through their own volition, they were absent from work without authorization, and during which they gave the agency no reason to believe they wanted to come to work. Choosing to absent themselves, petitioners created a situation in which the agency could not pay them, and at least an ambiguity in their pay status clarifiable only by action on their part. The view that one need not perform a knowingly futile act may be applicable to strikes in the private sector and to employer-created ambiguities. It is clearly inapplicable here. To order that petitioners be paid under the present circumstances is impermissible in view of long-standing federal pay policy and the necessity of distinguishing between those controllers who chose to report for duty

between the receipt of notice and the date of removal and those controllers who, like petitioners, did not.

■ Petitioners, moreover, bear the burden of establishing the Board's jurisdiction, *Stern v. Department of the Army*, 699 F.2d 1312 (Fed.Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983), and their failure to establish that they were ready, willing, and able to work during the involved period constitutes a failure to carry that burden. Procedures under 5 U.S.C. § 7513 are inapplicable to "voluntary actions initiated by the employee". 5 CFR § 752.401(c)(3) (1981). *See Taylor v. United States*, 591 F.2d 688, 219 Ct.Cl. 86 (1979). Non-duty status here was voluntary. It was not agency-enforced or agency-initiated disciplinary action. There was no suspension, constructive or otherwise. *See Armand v. United States*, 136 Ct.Cl. 339 (1956).

The argument based on a constructive suspension theory must fail.

#### (4) The Strike Period

Petitioner Giannattasio was not required to report for work until 11 a.m., August 12, 1981, apparently because he was on annual leave until that time. When he failed to report, he was served with a notice of proposed removal dated August 12, 1981, charging him with striking as of that date. Giannattasio contended before the Board that the agency had not proved the strike was still in progress on August 12. The Board rejected that assertion, finding that the strike continued at least through August 19, 1981.

It has been said that the agency must prove: (1) that a strike was in progress on the date striking is charged; and (2) that the employee could have returned to work on that date. *Ketcham v. Federal Aviation Administration*, 82 FMSR ¶ 7026 (May 28, 1982).

The unrebutted evidence in the present case shows conclusively that the New York Center air traffic controllers were not fired at 11 a.m. on August 5, 1981, and were not locked out at that time. Giannattasio concedes that the agency interpreted the President's August 3, 1981 announcement as permitting air traffic controllers to return to work at the time of their first assigned shift beginning after 11 a.m., on August 5, 1981.

■ There is no evidence in this record that if Giannattasio had attempted to return to work at 7 a.m. on August 12 he would not have been allowed to do so. Indeed, the evidence is to the contrary. As the Board noted, the chief of the New York Center "testified that each of the appellants would have been permitted to return to work prior to the deadline shift with which they were charged with striking." Nor is there any evidence that Giannattasio was removed before August 28, 1981, after he had received the notice of proposed termination and filed a written reply thereto.

The only remaining issue is whether substantial evidence supports the Board's findings that the strike still continued on August 12, 1981, and that Giannattasio's failure to report on that date constituted participation in the strike. There is no doubt that a strike began on August 3, 1981. That strike continued until some event ended it.

There is no evidence that the union terminated the strike before August 12, 1981. Substantial absences continued at the New York Center well into September, as did picketing with signs stating "PATCO LOCAL 201 ON STRIKE" and numerous statements by union officials that the strike of Local 201 was continuing. Neither did the government end the strike before that date by terminating the employment relationship between itself and the controllers. Although the government had begun procedures to remove the controllers by August 12, Giannattasio and many of his fellow controllers were still employees on that date.

Giannattasio relies on pronouncements and press statements of various government officials indicating that the strike ended before August 12, 1981, and on statements in court opinions indicating that the strike ended before August 19, 1981.

*See United States v. Haggerty,* 528 F.Supp. 1286 (D.Col.1981).

The government cites other authority in support of the Board's finding that the strike continued substantially beyond August 5, 1981. *See United States v. Taylor,* 693 F.2d 919 (9th Cir.1982) (air traffic controller convicted of participating in the PATCO strike on August 8, 1981); *PATCO v. F.L.R.A.,* 685 F.2d 547 (D.C.Cir.1982) (holding that strike lasted until November 1981); *United States v. PATCO,* 527 F.Supp. 1344 (N.D.Ill.1981) (preliminary injunction on November 11, 1981, restricting place and manner of picketing by striking air traffic controllers); *PATCO v. Federal Aviation Administration,* 7 F.L.R.A. No. 10 (Nov. 3, 1981) (supplemental opinion of Chairman noting PATCO had neither disavowed nor attempted to end the strike as of November 3, 1981).

The evidence upon which Giannattasio relies does not undermine the Board's findings that the strike continued until at least August 19, 1981. However government officials may have viewed the strike, the objective facts outlined above support the Board's findings.

We hold that substantial evidence supports the Board's finding that the strike continued at the New York Center at least until August 19, 1981. Our review function thereupon ends.

Petitioners having made no attempt to rebut the foregoing evidence before the Board, Adams' brief suggests before us that the sign-carrying picketers may not have been striking controllers, but "just members of the public merely exercising their first amendment rights." The argument is imaginative but without merit in light of all the evidence.[5]

**5.** An *amicus* in appeal No. 83–1156 chastises the Board for taking "official notice" that a nationwide strike continued through August 6, 1981. The issue does not appear to have been raised before the Board in any of the "lead" cases, by way of petition for reconsideration or otherwise. Because, also, the agency proved Baracco was on strike through August 7, 1981, because

(5) *Other Petitioners*

Listed in Appendix B to this opinion are other petitioners whose appeals were consolidated for decisional purposes before the Board in *MSPB Docket No. NY075281F0424* and who filed individual appeals under the numbers listed. The issues in those appeals appear to have been considered and decided in this or another of the decisions handed down by the court today. Petitioners listed in Appendix B shall notify the court within 14 days of the date of this opinion regarding their intent to withdraw or further prosecute their appeals. Absent notification within that period, the appeals listed in Appendix B will be dismissed. *See Asberry v. Postal Service,* 692 F.2d 1378, 215 USPQ 921 (Fed.Cir. 1982).

## DECISION

Accordingly, the Board's decisions sustaining the removal of petitioners in Appeal Nos. 83–1155 and 83–1156 are *affirmed.*

AFFIRMED.

## APPENDIX A

| Petitioner | MSPB Docket No. | Court Docket No. |
|---|---|---|
| Richard T. Adams | NY075281F0424 ) | |
| | ) | |
| Richard J. Bender | NY075281F0435 ) | |
| | ) | |
| Richard Bronleben | NY075281F0454 ) | |
| | ) | |
| Antonio Chevalier | NY075281F0477 ) | 83–1155 |
| | ) | |
| Thomas R. Connelly | NY075281F0486 ) | |
| | ) | |
| Thomas J. Contegni | NY075281F0488 ) | |
| | ) | |
| Gerard Curran | NY075281F0500 ) | |
| | ) | |
| James N. Fry | NY075281F0548 ) | |
| | ) | |
| Allen Giannatasio | NY075281F0556 ) | |

Baracco made no effort to refute the facts noticed, *see Ohio Bell Telephone Co. v. Public Utility Commission of Ohio,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), and because the Board did not deny petitioners their due process right to establish the nonexistence of a strike at their location or their nonparticipation as strikers, the issue is inappropriately argued here.

## APPENDIX B

| Petitioner | MSPB Docket No. | Court Docket No. |
| --- | --- | --- |
| Raymond Miller | NY075281F0671 | 83–1159 |
| Edward Rocks | NY075281F0748 | 83–1160 |
| William Amodeo | NY075281F0430 | 83–1162 |
| Robert Biancamano | NY075281F0439 | 83–1163 |
| Bruce Bonacum | NY075281F0442 | 83–1164 |
| John Brunner | NY075281F0457 | 83–1165 |
| Richard Burns | NY075281F0460 | 83–1166 |
| Kenneth Carlstrom | NY075281F0469 | 83–1167 |
| William Cecil | NY075281F0473 | 83–1168 |
| Charles Contegni | NY075281F0487 | 83–1169 |
| Charles Darcy | NY075281F0507 | 83–1170 |
| Wayne Ennis | NY075281F0531 | 83–1171 |
| James Finnegan | NY075281F0538 | 83–1172 |
| Gary Dawson | NY075281F0509 | 83–1176 |

NIES, Circuit Judge, concurring.

I join in the majority opinion and write only because I see a need for treatment of the issue of harmful error to a greater extent than it has been given in note 3 of the majority opinion.

The *Baracco* appeal is the lead case on interpretation of the harmless error provision found in 5 U.S.C. § 7701(c)(2)(A) vis-a-vis the statutorily mandated time period for reply to the notice of proposed removal. Baracco asserts that he was given only 6 days to reply, but for reasons not discussed in the majority opinion or pertinent to other controllers.

Baracco was sent the same notice as other controllers. Thus, under the majority decision here, he was initially given a 7-day notice period. The notice was mailed August 7 by regular mail with a duplicate sent the same day by certified mail. Since Baracco did not testify, we do not know when he received the notice by regular mail which, if before receipt of the certified mail, would have started the running of the reply period. In any event, he signed for the certified mail on August 11. In an undated letter from Baracco to the agency received August 14, he requested an extension of time to file written reply on the ground that "seven days" was not a reasonable time for filing a response. At that time he knew he had 7 days, as the MSPB found. In reply, the agency denied "an extension of time to submit a written reply beyond the seven day period." Had the agency letter stopped there, Baracco would have no basis for argument that he is in a different situation from others. However, in the same letter, the agency stated that the written response was to be submitted "prior to August 18, 1981, the expiration of the seven day notice period."

Treating this as arguably creating an ambiguity as to the final date for reply, the presiding official ruled that Baracco would have had to show, in any event, that a 6-day reply period was harmful error, that is, that the error might have affected the outcome of the case. Since Baracco had made a written reply within 7 days and offered no evidence at any time of individual circumstances which might have changed the outcome, the presiding official ruled that Baracco failed to show harmful error. The board agreed that Baracco was required to show that the asserted procedural error was harmful.

Baracco's position is that harmful error should not have entered into resolution of the issue of the shortened notice period. Baracco maintains that his right to a minimum 7-day reply period, unquestionably required by 5 U.S.C. § 7513(b)(2), rendered the action "not in accordance with law" within the meaning of 5 U.S.C. § 7701(c)(2)(C), set out below, and that, therefore, reversal is required. In essence, Baracco argues that a statutory procedural requirement is not subject to the harmful error provision of 5 U.S.C. § 7701(c)(2)(A). Stated another way, violation of a statutory procedural requirement is harmful *per se.*

The statutory provisions under consideration here read in pertinent part:

7701(c)(2) [T]he agency's decision may not be sustained ... if the employee ...—

(A) shows harmful error in the application of the agency's procedures in arriving at such decision.

\* \* \* \* \* \*

(C) shows that the decision was not in accordance with law.

The MSPB carefully reviewed the statutory history of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (1978) (Reform Act) to discern the relationship of these two provisions and found no clear guide to their interpretation. However, it found direction, in favor of the presiding official's ruling, in the numerous expressions of concern during hearings on the Reform Act about unnecessary procedural reversals of agency actions.[1]

In rejecting Baracco's argument, the board also found guidance in the need to give effect to all parts of the statute. The board reasoned that procedural regulations have the force of law and that, if the harmful error provision could not be applied in connection with procedures established by statute, by the same token, it could not be applied to procedures established by regulations which have the force of law. Therefore, the statutory provision on harmful error would be meaningless.

The board then reviewed and reconciled its own decisions with its holding here, and, finally, found support for its interpretation in precedent of this court, particularly, *Doyle v. Veterans Administration,* 667 F.2d 70, 72, 229 Ct.Cl. 261 (1981); *Brewer v. U.S. Postal Service,* 647 F.2d 1093, 1097, 227 Ct.Cl. 276 (1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982) and *Shaw v. U.S. Postal Service,* 697 F.2d 1078 (Fed.Cir.1983). For example, as stated by Senior Judge Cowen in *Brewer,* the first case reviewed by the Court of Claims under the Reform Act:

> In enacting the Civil Service Reform Act of 1978, Congress declared that this court should reverse agency actions for procedural error "only if the procedures followed substantially impaired the rights of the employees." S.Rep. No. 969, 95th Cong., 2d Sess. 64, *reprinted*

*in* [1978] U.S.Code Cong. & Ad.News 2723, 2786.

647 F.2d at 1097.

In support of the contrary position, petitioner cites cases, for example *Ryder v. United States,* 585 F.2d 482, 218 Ct.Cl. 289 (1978) and *Washington v. United States,* 147 F.Supp. 284, 137 Ct.Cl. 344 *cert. denied,* 355 U.S. 801, 78 S.Ct. 6, 2 L.Ed.2d 19 (1957), which are clearly no longer controlling in view of the addition to the statute of the harmful error provision.

Turning again to the precise language of the statute, I conclude that paragraphs (A) and (C) are directed at different evils. Harmful error in procedures (paragraph A) raises the question: Did the wrongful procedure harm the employee in the presentation of his defense so that a different result might have been reached? Petitioner here has not asserted such harm. He asks simply for a *per se* rule. That is not a "showing" of harm as the statute requires. Paragraph (C), on the other hand, is directed *to the decision* itself. Was the decision in its entirety in accordance with law? Since the harmful error rule is part of the law, the question becomes: Is the decision in accordance with the law including the harmful error provision? Tested against this standard, the *Baracco* decision cannot be reversed since no harmful error has been shown.

---

**1.** *See Hearings Before the Senate Committee on Governmental Affairs on S. 2640, S. 2707 and S. 2830,* 95th Cong. 2d Sess. 22, 43, 101, 146 (1978); *Hearings Before the House Committee on Post Office and Civil Service on H.R. 11280,* 95th Cong., 2d Sess. 31, 122–23 (1978).