**Kipp ANDERSON, et al.,* Petitioners,**

**v.**

**DEPARTMENT OF TRANSPORTA-TION, FAA, Respondents.**

**Appeal No. 83-1153.**

United States Court of Appeals, Federal Circuit.

May 18, 1984.

---

* The names of the petitioners in Appeal No. 83–1153 are listed in the appendix. Petitioner Robert L. Potty, Appeal No. 83–1157, shall notify the court within 14 days of the date of this opinion of his intent to withdraw or further prosecute his appeal. *See Adams v. Department of Transportation, FAA,* 735 F.2d 488 (Fed.Cir.1984).

Thomas H. Bornholdt, Overland Park, Kan., argued for petitioners.

Robert A. Reutershan, Washington, D.C., argued for respondent. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, and Sandra P. Spooner, Asst. Director, Washington, D.C., Diane R. Liff, Asst. Gen. Counsel for Litigation, Dept. of Transp., Washington, D.C., of counsel.

Stephen C. Cooper and Steven Z. Cohen, Southfield, Mich., were on the brief for amicus curiae in support of petitioners.

Edward J. Hickey, Jr., Gen. Counsel, Public Employees Dept. AFL–CIO, Washington, D.C., was on the brief as amicus curiae in support of petitioner.

H. Craig Becker, Washington, D.C., was on the brief as amicus curiae in support of petitioner.

Mitchell Notis, Staff Counsel, American Federation of Government Employees, Washington, D.C., was on the brief as amicus curiae in support of petitioners.

Marci B. Seville, Burton F. Boltuch and Jonathan H. Siegel, of counsel, Oakland, Cal., was on the brief as amicus curiae in support of petitioners.

Before MARKEY, Chief Judge, and FRIEDMAN, RICH, SMITH and NIES, Circuit Judges.

NIES, Circuit Judge.

The petitioners of this appeal are former air traffic controllers employed at Olathe Route Air Traffic Control Center (ARTCC) in Olathe, Kansas. As in the related cases decided today, petitioners seek reversal of a decision by the Merit Systems Protection Board (board) upholding the adverse actions taken by the Department of Transportation's Federal Aviation Administration against each of the petitioners.

The petitioners here raise numerous issues which have been treated in other opinions issued today, including:

1. The agency failed to make a *prima facie* case of the charge of striking and erred in shifting the burden to each petitioner to prove he was not striking. *See Schapansky v. Department of Transportation, FAA,* 735 F.2d 477 at 482–84 (Fed.Cir. 1984).

2. The deadline shift rule created confusion with respect to individual dead-

lines and rebuts the *prima facie* case that an individual was striking. *See Adams v. Department of Transportation, FAA,* 735 F.2d 488 at 490–92 (Fed.Cir.1984).

3. Actions by the President and high administration officials were unlawful and deprived petitioners of a meaningful opportunity to reply. *See DiMasso v. Department of Transportation, FAA,* 735 F.2d 526 at 528 (Fed.Cir.1984).

4. Petitioners were unlawfully suspended and improperly required to show that they were ready, willing and able to return to work. *See Adams,* at 492–93 (Fed.Cir.1984). (Of petitioners in this appeal, only Kolody was found to have been wrongfully suspended.)

5. The agency failed to take all factors into consideration in imposing penalty. *See Schapansky,* at 484–485.

6. Implementation of deadline shift rule resulted in disparate treatment. *See Schapansky,* at 485.

The record in this appeal requires further consideration of the second issue listed above, i.e., confusion created by the deadline shift rule. An amicus brief was filed on this issue and, unlike the *Adams* case, individual controllers here testified concerning their confusion. In addition, several petitioners raise issues dependent on the special circumstances of their individual situations.

### I

As an initial matter, we hold that substantial evidence, as detailed in the presiding official's decision and affirmed by the board, establishes that the strike continued at the Olathe ARTCC at least through August 12, 1981.

### II

#### Confusion Over Deadline

On August 3, 1981, at 7:00 a.m. E.D.T. the Professional Air Traffic Controllers Organization (PATCO) called upon its members to participate in a nationwide strike against the FAA. After the strike began, each of the petitioners was sent a telegram which stated:

> AN ILLEGAL STRIKE IS IN PROGRESS. PARTICIPATION IN A STRIKE CAN RESULT IN SEVERE DISCIPLINARY ACTION, INCLUDING REMOVAL AND POSSIBLE CRIMINAL PENALTIES. ANY UNAUTHORIZED ABSENCE FROM THE FACILITY WHEN SCHEDULED OR DIRECTED TO REPORT FOR DUTY INDICATES THAT SUCH PERSONS ARE PARTICIPATING IN THE STRIKE. ALL CONTROLLERS ARE TO REPORT FOR DUTY FOR THEIR SCHEDULED SHIFTS UNLESS DIRECTED OTHERWISE BY FACILITY MANAGEMENT.

The public announcement by the President on August 3, 1981, at 11:00 a.m. E.D.T. stated, in part:

> I must tell those who failed to report for duty this morning they are in violation of the law and if they do not report for work within 48 hours they have forfeited their jobs and will be terminated.

The agency implemented the President's 48-hour deadline by sending a notice of proposed removal to each controller who failed to report for duty at the first shift to which the controller was directed or regularly scheduled to report after 11:00 a.m. (E.D.T.) August 5, 1981.

None of the petitioners of this appeal ever again reported for duty at the Olathe ARTCC (except Kolody) and none of them called the facility to explain their absence.

The petitioners here argue that they thought they were fired as of the 11:00 a.m. (E.D.T.) deadline, and this "prevented controllers who otherwise would have returned to duty from so returning in a timely fashion." While phrased somewhat differently, this is, in essence, the argument characterized in *Adams,* at 490, as "disingenuous." It does not change its nature

by virtue of testimony of individual controllers that they were confused. No steps were taken by these individuals to clear up any ambiguity as to their individual final deadlines. Petitioners say their inaction should be excused because, had they contacted the center to clear up any ambiguity about their deadline, they would have been ordered to come in before their deadline. In petitioners' view, it follows that the Government was obligated to contact each petitioner to clear up any ambiguity.

Contrary to petitioners' argument, the grace period granted by the President did not relieve controllers of all obligations to their employer during the grace period. Thus, petitioners' premise that the controllers were fired only for their failure to report for their deadline shift, and not for conduct prior thereto, is false. Manifestly, confusion as to the deadline shift cannot excuse anyone's failure to report when scheduled before the deadline.

Amicus' reliance on *Olshock v. Village of Skokie*, 411 F.Supp. 257 (N.D.Ill.), *aff'd*, 541 F.2d 1254 (7th Cir.1976), (Wood, J., dissenting) is misplaced as authority for its argument that discharges under the deadline shift rule are not in conformity with constitutional rights. In *Olshock*, the governmental authority attempted to justify the disparate punishments, discharge vis-a-vis suspension, meted out to striking policemen. The Government argued that the punishment depended on whether a policeman returned to duty before or after a July 13 deadline. In rejecting that defense on the facts and holding that the difference could only be attributed to other reasons, the court noted, *inter alia:*

> Nowhere does the record or the findings indicate that the discharged men were advised by anyone that July 13 was a crucial deadline between future professional life and death.

Unlike the Skokie policemen, the controllers here were treated evenly. And most importantly, none of the petitioners here assert that they were unaware of a deadline to the grace period. Their purported

confusion was only that it was somewhat later than 11:00 a.m. E.D.T. on August 5.

With respect to the argument that notice was required to prevent deprivation of part of their grace period, this position was rejected in *Adams*, at 492:

> Having disregarded the initial 48 hours moratorium, petitioners can hardly complain that they were not specifically and personally notified that each had an opportunity to also disregard an extension of that moratorium. There is nothing whatever of record to indicate that any petitioner would have returned or had any interest whatever in returning to work at the time of his next regularly scheduled shift.

In these appeals as well, the argument is simply an argument without factual support.

### Lester E. Cooke, Jr.

■ Petitioner Cooke asserts that the board erred in ruling that he had not been denied an opportunity to present an oral reply to the notice of removal, and that, in any event, such denial would not have constituted a harmful error. Petitioner Cooke testified that a call was made to him, scheduling his oral reply for 9:15 a.m. and that he showed up no later than that time only to learn that his reply time had been commenced at 9:00 a.m. and was concluded. A union representative had, however, appeared on his behalf at 9:00 a.m. The FAA refused to schedule another time to hear his oral reply. Mr. Cooke stated that only then did he agree to permit the presentation made by the union representative to constitute his oral reply, rather than presenting none. He testified that if he had been afforded a reply he would have raised the defenses considered by the presiding official at the subsequent hearing, i.e., that he was confused as to his individual deadline; that he was fearful about returning to the facility because he had seen a controller hauled off in schackles in South Carolina by law enforcement officers; and because he was afraid for the flying public and could not in good con-

science perform his duties. These arguments *were* made by other petitioners in this appeal.

The agency submitted a document signed by an agency employee, C.B. Hooper, which indicates that Mr. Hooper contacted petitioner Cooke on August 15, 1981, and scheduled his oral reply for August 18, 1981, at 9:00 a.m. The presiding official found that petitioner Cooke had actual notice of the time of his oral reply. Considering the record as a whole, it cannot be said that substantial evidence does not support this finding.

Accordingly, the finding cannot be set aside under 5 U.S.C. § 7703(c)(3).

### Thomas G. Downs

■ Petitioner Downs did not present an oral reply before the agency. He asserts that he did not personally receive the notice of proposed removal until August 14, 1981, and, therefore, believed that he had until August 21, 1981, to request an oral reply time. His oral reply request was received by the agency on August 20, 1981, but was held to be untimely. The basis for this ruling was that the notice was sent to the mailing address furnished by petitioner and was signed for by his mother on August 10, 1981. It was held, therefore, that the August 10, 1981, date was the date of constructive receipt. This ruling is in accordance with precedent of this court and is affirmed. *Ramos v. United States,* 683 F.2d 396 (Ct.Cl.1982).

### Robert P. Chamberlain, Jr.

■ Petitioner Chamberlain asserts that the MSPB erred in holding that he did not rebut the Government's *prima facie* case that he was on strike by his testimony that during the strike period he was physically incapable of performing his duties.

Chamberlain testified that due to an allergic flareup, he began taking disqualifying medication on August 3, 1981, and that the presiding official and the board could not reject uncontroverted testimony on the basis of lack of credibility. Admittedly, Chamberlain did not report his illness to the agency, and his testimony with respect to illness during the strike period was uncorroborated. There is, however, also no question but that routinely requests for sick leave were denied during the strike. Accordingly, Chamberlain asserts that a request for sick leave would have been a futile gesture and that he feared the agency would believe that he was intentionally disqualifying himself if he called in sick.

The board recognized that from time to time, over a three year period, Chamberlain was bothered by an allergy that sometimes required him to take medication which disqualified him for air traffic control duties. However, in the past, Chamberlain had performed administrative duties at such times. The board could not accept Chamberlain's rationale that reporting illness or appearing only for administrative duty would more likely be interpreted as strike-support than a complete failure to report.

On appeal, Chamberlain asserts that his fear was that he would be forced to work traffic, notwithstanding his medication, and that the board failed to appreciate this defense. We do not see in the board's decision a lack of comprehension of his defense, but rather, a total rejection of his assertion that he was ill. As the board noted, despite opportunities during the reply process and in his petition for appeal, he failed to indicate that he was ill at the time of the strike. Indeed, Chamberlain did not put forth this reason for not appearing for duties until the spring of 1982.

Accordingly, considering the record as a whole, it cannot be said that substantial evidence does not support the board's decision.

### Anthony M. Kolody

■ On August 8, 1981, two days prior to his receipt of the notice of proposed removal, petitioner Kolody requested the assistance of a facility training instructor, Ed Boeger, to facilitate his return to work. Boeger arranged an informal meeting at the facility later that day with facility Chief Rex McQueen, at which time Kolody in-

formed McQueen that he wanted to return to work. Before the presiding official, Kolody asserted that he had been promised by McQueen at that meeting that he would have only a 10-day suspension. McQueen testified that he did tell Kolody that he had a good case, but he denied ever promising Kolody that he would receive only a suspension. The presiding official found McQueen more credible than Kolody. Before the MSPB, Kolody had argued that McQueen's actions created an estoppel to removal.

On appeal, the conversation with McQueen is relied upon to support Kolody's argument that he never presented a "meaningful reply" to the notice of proposed removal. He asserts that McQueen's assurances that the hearing would be no more than a formality to his reinstatement led him to appear without counsel.

Other evidence of record concerning the conversation between Kolody and McQueen, provided by Boeger, supports McQueen's version of what happened at the interview. Specifically, Boeger testified that McQueen did not tell Kolody that he would get his job back but rather said that Kolody would have to go through the oral hearing, and that he had as good a case as anyone. We do not find in these statements any assurance that the oral reply would be a mere formality. Boeger's supplemental affidavit proffered to the board does not contradict his earlier testimony.

Accordingly, there is no basis for Kolody's defense that McQueen's actions effectively deprived him of a meaningful reply to the agency. Nor was he prevented from raising any defense at his hearing before the presiding official. Indeed, it is noted that Kolody was successful in his charge that he was improperly suspended after appearing for duty on August 8, and thus he was found entitled to pay from the 8th until his termination date.

### John S. Sellers

■ Petitioner Sellers seeks a remand for the purpose of presenting additional evidence in support of his testimony before the presiding official that prior to his actual deadline, he was informed by his supervisor, Assistant Chief Joe West, that he was fired. As a result of that conversation and his lack of awareness of his deadline shift, he believed it was futile to attempt to return to work. West testified that he did talk to Sellers and others on the picket line on August 5, 1981, and told them if they did not come to work they would be fired. West specifically denied telling Sellers that he had already been terminated. The board held that Sellers's challenge to the presiding official's determination that West was the more credible witness did not merit review. With respect to the affidavits proffered with the petition for review as newly discovered evidence, the board held that the affidavits did not raise a serious evidentiary question in light of the fact that Sellers did not mention the alleged conversation with West at any time prior to the hearing despite numerous opportunities to do so. The board noted that in answers to interrogatories, Sellers stated that he believed he had been terminated on August 5, 1981, at 10:00 a.m. C.D.T. (11:00 a.m. E.D.T.) because of statements of the President and the Secretary of Transportation. At no time did he refer to the conversation with West or indicate that it was the basis for his belief that he had been fired.

While one of the affidavits concerned an event that occurred after the hearing and may, therefore, qualify as newly discovered evidence, we do not find that the board abused its discretion in refusing to reopen Sellers's hearing for the receipt of the additional evidence, inasmuch as the board adequately explained and, in our view, justified its decision not to do so. The request for a remand is denied.

### Stephen L. Miller

■ On appeal, for the first time, petitioner Miller raises the issue that his annual leave was wrongfully cancelled on August 2, 1981, because the cancellation was not in compliance with the terms of the collective bargaining agreement. Thus,

Miller argues that the charge that he was striking on days when he was properly on leave cannot be sustained. This defense has been rejected in *Letenyei v. Department of Transportation, FAA,* 735 F.2d 528 (Fed.Cir.1984), and *Campbell v. Department of Transportation, FAA,* 735 F.2d 504 at 506 (Fed.Cir.1984), also decided today and, thus, we need not consider the Government's assertion that the issue was not properly raised by Miller.

### DECISION

Accordingly, the board's decision sustaining the removal of petitioners in this appeal is *affirmed.*

AFFIRMED.

### APPENDIX

Mr. Kipp C. Anderson
Mr. Eugene M. Arnott
Mr. Thomas E. Bertels
Mr. Gerard A. Blume
Mr. Robert P. Chamberlain, Jr.
Mr. Lester E. Cooke, Jr.
Ms. Paula J. Downs
Mr. Thomas G. Downs
Mr. Larry A. Drury
Mr. William L. Ebeling
Mr. Steven C. Flynn
Mr. James W. Fuester
Mr. Merle M. Haas
Mr. William R. Harms
Mr. Michael J. Haynes
Mr. Michael W. Ingle
Mr. Loyd G. Kaullen
Mr. Ralph J. King
Mr. Anthony M. Kolody
Mr. Michael J. Larkin
Mr. Curtis L. Lawson
Mr. Ronald J. McNeel
Mr. George L. Middlemas, Jr.
Mr. Stephen L. Miller
Mr. Gary E. Nelson
Mr. Rex A. Olsen
Mr. Theo A. Philbrick
Mr. Scott D. Plumb

Ms. Jeanette L. Ramirez
Mr. James E. Richards
Mr. John S. Sellers
Mr. Kenneth J. Stramberg
Mr. Richard E. Voegele
Mr. Earl D. Zongker